UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

ANDREA FREEMAN, et al.          )
                                )
        Plaintiffs,             )
                                )        No. 3:12-CV-01255-DRH-SCW
v.                              )
                                )
BERKELEY CONTRACT PKG, LLC,     )
et al.                          )
                                )
        Defendants.             )

**<u>DEFENDANT BERKELEY CONTRACT PACKAGING, LLC'S RESPONSE
TO PLAINTIFFS' FIRST AMENDED COMBINED MOTION
TO CONDITIONALLY CERTIFY CLASS</u>**

## INTRODUCTION

In this action, four former employees of Berkeley Contract Packaging, LLC ("Berkeley") seek to recover alleged uncompensated overtime wages under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

Plaintiffs seek conditional certification to send notice pursuant to §216(b) of the FLSA to all current and former employees of Berkeley who were employed as line workers at any time from August 23, 2010 to the present and who did not receive overtime compensation.  Plaintiffs allege that they were required by Berkeley to arrive 15 minutes before the start of each shift to attend 15-minute mandatory meetings.  Second Am. Complaint, Doc. 39 ("SAC") ¶¶ 15, 20-22.

Plaintiffs' motion for conditional certification should be denied because Plaintiffs have failed to provide sufficient facts showing the existence of a common early arrival policy by Berkeley.  Rather, Plaintiffs seek to tie Berkeley to an alleged policy of R.E.M. Group, Inc. ("REM"), a temporary staffing agency, yet provide no evidence that this alleged REM policy was applied by Berkeley against its employees.  In fact, the sole document on which Plaintiffs rely to show the alleged "policy" of Berkeley: (1) was drafted by REM for REM employees; (2) was never submitted to Berkeley for review or approval ("Berkely" is even misspelled); (3) was not provided to any Berkeley employees; (4) does not contain any date or employee signatures; and (5) does not reflect Berkeley policy.

In fact, the evidence demonstrates that Berkeley had ***no*** common policy regarding early arrival that was uniformly applied to Berkeley line worker employees.   Instead, as set forth in the Berkeley Employee Handbook, Berkeley line workers were expected to "be at [their] workstation or on-line ***at the start of the shift***."  A sampling of the time cards from the proposed

1

class period further demonstrates that Berkeley employees arrived at various times, up to and including their shift start time.

Furthermore, Plaintiffs fail to provide evidence of which employees are "similarly situated," excluding any facts relating to the extent to which the alleged arrival policy of Berkeley was applied to Berkeley employees, such as: (1) which shifts were affected by the alleged policy: (2) when the alleged policy became effective; (3) the duration the alleged policy was in effect; (4) whether and how the alleged policy was ever enforced or otherwise uniformly applied to other Berkeley employees.  Plaintiffs also do not identify any "similarly situated" REM employees or explain why Berkeley must allegedly pay REM employees for time spent waiting to be engaged, which is not compensable under the FLSA.

Finally, if conditional certification is granted, Plaintiffs' proposed notice should be amended to: (1) only apply to line workers at the Unilever facility in Edwardsville, Illinois who actually arrived 15 minutes before their shift and did not receive overtime wages; (2) identify the particular shifts at issue; and (3) limit the class period based on the three year maximum statute of limitations permitted by the FLSA.

## STATEMENT OF FACTS

### Berkeley Contract Packaging, LLC

1.     Berkeley is an Illinois LLC engaged in the business of providing packaging services for Unilever® soaps, shampoos and other consumer goods products at Unilever's Edwardsville, Illinois facility (the "Facility").  Declaration of Ryan Krause ("Krause Dec."), ¶ 4, filed herewith and incorporated herein by reference.

2.      To perform this work, Berkeley hires employees to perform line work during two shifts: 6:00 a.m. to 4:30 p.m. and 5:00 p.m. to 3:30 a.m.  Krause Dec. ¶ 5.[1]  Each shift contains a 30-minute unpaid lunch break and two 15-minute paid breaks.  Krause Dec. ¶ 5.

3.      Generally, Berkeley's work week is Monday through Thursday.  Krause Dec. ¶ 7.

4.      Berkeley employees are paid by Berkeley on an hourly basis.  Exhibit A, Deposition of Andrea Freeman ("Freeman Dep.")  34:9-15; Krause Dec. ¶ 8.

5.      Some line workers work forty hours or more per week, while others work less than forty hours per week.  Krause Dec. ¶ 9.  An individual's hours may also vary from week to week.  For example, Plaintiff Freeman worked 40.00 hours during the week ending February 12, 2012, and 11.25 hours during the week ending February 26, 2012.  Krause Dec. ¶ 9.

**Berkeley Policies**

6.      Berkeley has never had a written policy requiring its line workers to arrive 15 minutes before the start of their shift, and it does not require its line employees to arrive 15 minutes before the start of their shift.  Krause Dec. ¶ 10.  Plaintiffs have provided no evidence of any such written policy of Berkeley, and Plaintiff Freeman concedes there was no such written policy.  Ex. A, Freeman Dep. 155:16-24.

7.      As set forth below (*see* ¶¶ 52-54), the written "policy" on which Plaintiffs rely is an undated, unsigned document created solely by REM, without Berkeley review or approval, and which is not presented to Berkeley employees.  *See* Pl. Memo Supp. First Am. Mot. Cond. Cert. Class. (Doc. 44) ("Cond. Cert. Memo"), Ex. C; Krause Dec. ¶ 11; Ex. A, Freeman Dep. 98:4-99:14.

---

[1] As of July 2013, Berkeley only operates one shift in the morning, from 6:00 a.m. to 4:30 p.m. Krause Dec. ¶ 5.

8.     To advise Berkeley employees of Berkeley's policies and procedures, Berkeley requires each of its line workers to participate in an orientation, during which it explains Berkeley's policies and procedures.  Ex. A, Freeman Dep. 151:13-152:8.

9.     During the orientation, Berkeley provides its employees with a Company Handbook (the "Handbook"), which sets forth the policies and practices of Berkeley.  Ex. A, Freeman Dep.  155:11-13;  Krause Dec. ¶ 12, Ex. B.

10.     Each Berkeley employee acknowledges receiving, reading, and understanding the Handbook.  *See* Krause Dec. Ex. B, Berkeley Handbook p. 22; Ex. A, Freeman Dep.  154:4-9.

11.     Nothing in the Handbook states that employees must arrive 15 minutes prior to their scheduled shift.  Instead, in accordance with Berkeley's policy, the Handbook requires only that workers "be at [their] workstation or on-line ***at the start of the shift***, unless otherwise directed by management."  Krause Dec. Ex. B, Berkeley Handbook, p.16.[2]

12.     Berkeley's policy is simply that line workers are required to be on their lines and begin working at the start of their shift, which commences with the ringing of a bell that is programmed to ring at the scheduled shift start time each day.  Krause Dec. ¶ 13.

## Berkeley Clock-In Procedure

13.     Berkeley keeps track of its employees' working hours by using time cards and a time clock.  Krause Dec. ¶ 15.

14.     Beginning at approximately fifteen minutes before each shift, a Berkeley Production Assistant stations herself at the Berkeley time clock.  Krause Dec. ¶ 17.

---

[2] Some Berkeley employees who are not line workers, such as housekeepers and bailers, are directed by management to begin working prior to the scheduled shift start time.  These non-line workers are paid the additional time during which they are working.  Krause Dec. ¶ 14.

15.     As the Berkeley employees arrive for work, they walk through the entrance, pull their timecards from a wall file next to the time clock, and hand the time cards to the Production Assistant, who clocks them in.  Krause Dec. ¶ 18.

16.     This process continues up to the start of the shift as the Berkeley employees arrive.  Krause Dec. ¶ 19.

17.     It takes approximately three seconds to punch a single time card in the Berkeley time clock.  Krause Dec. ¶ 20.

18.     Berkeley employees continue to arrive up to, and in some instances after, their shift start time.  Krause Dec. ¶ 21.  A sampling of the time cards from the proposed class period shows Berkeley employees clocking-in up to, and even after, their scheduled shift start time.  Krause Dec. ¶ 22.  For instance, on July 8, 2012, one Berkeley employee clocked-in at 5:51 a.m., two at 5:52, two at 5:53, ten at 5:54, nine at 5:55, and thirteen at 5:56.  Krause Dec. Ex. C.

## Berkeley Post-Clock-In Practices

19.     Berkeley employees who arrive before the shift starts are free to wait in the break room.  Krause Dec. ¶ 23.

20.     Freeman concedes that during this period, the line workers do not engage in any work or participate in any meetings.  Ex. A, Freeman Dep. 159:6-160:8, 184:16-185:1.

21.     Although there is no set policy, generally, approximately seven minutes before the shift start time, the Berkeley Assistant Production Manager begins to give line assignments to Berkeley employees who have arrived and clocked-in.   This process continues up to, and in some instances after, the shift start time.  Krause Dec. ¶ 24.

22.     Contrary to the allegations in the Second Amended Complaint, Plaintiff Freeman concedes that there are, in fact, no mandatory meetings.

5

Q        I want to know about the mandatory meetings.

A        Some days that's – that's when she called the lines.

Q        Okay.  They weren't really meetings where she –

A        No.  It was just -- it was – you'd meet out by her desk and that's when she called the lines.

Q        Okay.

A        That -- that was the meeting.

Ex. A, Freeman Dep. 184:16-185:1.

23.    Furthermore, Plaintiff Freeman concedes that although the time at which employees were informed of their line assignments varied by day, it was ***not*** a process that lasted 15 minutes.

Q        Okay.  Next Interrogatory, 9c.  We asked you about the mandatory meetings and particularly 9c we asked you how long, the duration of the mandatory meetings; right?  And the answer you gave is, these meetings were usually 15 minutes long.  Do you see that?

A        Yes.

Q        And that's not right, is it?

A        No.

Ex. A, Freeman Dep. 186:2-11.

24.    As per the Handbook, Berkeley employees are expected to be on the line when the shift begins.  Krause Dec. ¶ 13.

## **Berkeley Discipline**

25.    Plaintiff Freeman concedes that she was never disciplined by Berkeley for arriving less than 15 minutes before her shift.  Plaintiff Freeman further concedes that she does

not know of any other Berkeley employee so disciplined.  Ex. A, Freeman Dep. 162:22-163:1, 195:9-12.

## Commencement Of The Shift

26.     Each shift commences with the ringing of a bell that is programmed to ring at the scheduled shift start time each day.  Krause Dec. ¶ 25.

27.     After the ringing of the bell, the line employees begin working.  The conveyor belts used in the factory do not start until after the ringing of the bell.  Krause Dec. ¶ 25.

## The R.E.M. Group

28.     REM is a temporary staffing agency.  Krause Dec. ¶ 26.

29.     REM has an office in Collinsville, Illinois.  Ex.A, Freeman Dep. 90:16-91:2.

30.     REM does not have any common ownership with Berkeley. Krause Dec. ¶ 27.

31.     REM makes its own decisions as to who it hires and fires.  Krause Dec. ¶ 28.

32.     REM decides where its employees will be assigned.  Krause Dec. ¶ 29.

33.     REM assigns some of its employees to the Facility.  Krause Dec. ¶ 30.

34.     REM chooses which REM employees to send to the Facility.  Krause Dec. ¶ 31.

## REM Policies

35.     REM has policies and practices for its employees working at the Facility separate and distinct from Berkeley's policies and practices.  Ex. A, Freeman Dep.  152:13-16.

36.     At the time REM hires a new employee, REM conducts an orientation at its office in Collinsville, Illinois to convey its policies and practices to the new employee.  Ex. A, Freeman Dep. 90:16-91:2, 97:5-21.

37.     REM keeps its own managers on-site at the Facility.  Ex. A, Freeman Dep. 115:4-16; Krause Dec. ¶ 33.

**REM Sign-In And Clock-In Procedures**

38.     Upon arrival at the Facility, REM employees sign in on a REM sign-in sheet, which is located on a table right by the front door.  This table is separate from the Berkeley Production Manager desk.  Ex. A, Freeman Dep. 116:21-117:9-19.

39.     After a REM employee signs in, the REM manager gives the REM employee her REM time card, which is different from the Berkeley time cards, and the REM employee punches-in the REM time card.  Ex. A, Freeman Dep. 118:5-8; Krause Dec. ¶ 34.

40.     REM has its own time clock, which is different from the Berkeley time clock.  Ex. A, Freeman Dep. 124:19-24; Krause Dec. ¶ 34.

**REM Post-Clock-In Practices**

41.     After clocking-in, the REM employees wait to be notified by REM as to whether they will be engaged to work for the particular day.  Ex. A, Freeman Dep.101:12-102:18, 106:18-23.

42.     REM employees usually wait in the break room.  Ex. A, Freeman Dep. 197:19-21.

43.     No REM or Berkeley management is present in the break room.  Ex. A, Freeman Dep. 110:4-18.

44.     Plaintiff Freeman concedes that REM employees do not do any work while waiting in the break room.  Ex. A, Freeman Dep. 197:22-199:19.  While REM employees wait, they are free to eat and drink in the break room, talk to other REM employees, or use the restroom.  Ex. A, Freeman Dep. 197:22-199:19.

45.     Although there is no set policy, generally, approximately seven minutes before the shift start time, the REM manager begins selecting the REM employees for line assignments.  Krause Dec. ¶ 35.

46.      Plaintiff Freeman concedes that REM employees go to the Facility with the understanding that they may not be engaged to work on a particular day.  Ex. A, Freeman Dep. 206:12-18.

47.      Typically, REM employees who are not selected leave the Facility.  Ex. A, Freeman Dep. 123:6-8.  Sometimes, however, REM employees continue to wait beyond the shift-start time to see if they can be engaged to work based on scheduled Berkeley employees failing to show up or leaving early.  Ex. A, Freeman Dep. 125:6-126:7; Krause Dec. ¶ 36.

48.      Plaintiffs do not seek compensation on behalf of REM employees who were not selected by REM to work and sent home.

Q      Okay.  While you were sitting there and if you did not get picked, you're not seeking compensation?

A      I don't know.  I don't know.  We haven't –

* * * *

Q      Well, are you – are you wanting compensation for that?

THE WITNESS:  Can we take a break?

MR. SIVIA:  It's a question pending.

MR. CHARPENTIER:  I can tell you the answer to that is no.

MR. SIVIA:  Okay.

Ex. A, Freeman Dep. 200:24-201:4, 202:21-203:3.

49.      REM employees who are engaged to work on a particular day at the Facility are paid an hourly wage by REM.  Ex. A, Freeman Dep. 140:14-18, 146:20-22; Krause Dec. ¶ 37.

50.      Once selected, REM employees at the Facility report to REM managers, who are on-site and responsible for monitoring and disciplining REM employees.  Ex. A, Freeman Dep. 128:6-11, 137:9-11. Krause Dec. ¶ 33.

51.     Berkeley does not maintain personnel files of REM employees.  Krause Dec. ¶ 38.

### The REM Document

52.     At some unspecified time, REM created a document stating that REM employees "[m]ust be [at the Facility] 15 minutes prior to schedule starting time." Cond. Cert. Memo Ex. C.

53.     This REM document, which was produced by REM in discovery, was never shown to, reviewed, or authorized by anyone at Berkeley.  Krause Dec. ¶ 11.  In fact, Berkeley is spelled incorrectly in the document's title.[3]

54.     This REM document is unsigned and undated, and no party has produced a signed or dated copy of this document.  Plaintiff Freeman concedes that she did not sign such a document and has "no idea" whether it was presented to her at her REM orientation.  Ex. A, Freeman Dep. 203:5-14.

### REM Discipline

55.     If a REM employee was running late, she would notify REM's office, which would notify the REM manager on-site at the Facility.  Ex. A, Freeman Dep. 136:8-14.

56.     A REM employee who arrived less than fifteen minutes before the shift could still be engaged to work at the shift start time.  Ex. A, Freeman Dep. 136:8-137:24, 219:23-221:12.

57.     Plaintiff Freeman concedes that she was never disciplined by REM for arriving less than fifteen minutes before the scheduled shift start time, and she is not aware of any REM employee who was so disciplined.  Ex. A, Freeman Dep. 137:9-11, 197:2-7.

### REM Employees Subsequently Hired By Berkeley

58.     On some occasions, REM employees, such as Plaintiff Freeman, are hired as full-time employees of Berkeley.  Krause Dec. ¶ 39.

---

[3] Plaintiffs ignore this misspelling, referring to Plaintiffs' Exhibit C as the "Berkeley Memo." *See* Cond. Cert. Memo, p. 2.

59.     Former REM employees that are subsequently hired by Berkeley participate in the Berkeley orientation with other newly-hired Berkeley employees, at which they learn Berkeley's policies and procedures.  Ex. A, Freeman Dep. 151:13-152:12.

60.     Plaintiff Freeman concedes that she understood that Berkeley's policies and practices were different from the REM policies and practices.  Ex. A, Freeman Dep. 152:13-16.

## ARGUMENT

## I.     THE LEGAL STANDARD.

"Congress expressly authorized the certification of collective actions in the FLSA." *Marshall v. Amsted Rail Co*., 2012 U.S. Dist. LEXIS 161768, *7 (S.D. Ill. Nov. 13, 2012) (*citing* 29 U.S.C. 216(b)).  "Collective actions are treated as the equivalent of class actions in most aspects.  The principal difference is that in a collective action, unnamed plaintiffs must *opt in* to be bound by a judgment, whereas in a class action plaintiffs must *opt out* to escape being bound."  *Id.* (*citing Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 877 (7th Cir. 2012)).

"[A] majority of district courts employ an ad hoc two-step process to determine whether to certify a collective action under the FLSA."  *Id.* at *9.

Step one is conditional certification, "the purpose of which is to decide whether the proposed class should be notified of the pending action."  *Id.*  During this initial step, "with discovery not yet complete, the court's determination is made based on the pleadings and any declarations or affidavits submitted by the parties.  The named or 'representative' plaintiffs need only make a threshold showing that the putative plaintiffs are similarly situated."  *Id.* (citations omitted).  This requires plaintiff to show "some factual nexus that connects him to other potential plaintiffs as victims of an unlawful practice."  *Id.* at *10.  "To make this showing, Plaintiffs allegations must consist of more than 'vague allegations' with 'meager factual support' . . . ."

*Bouthner v. Cleveland Constr., Inc.*, 2012 U.S. Dist. LEXIS 28497, *15-16 (D. Md. Mar. 5, 2012) (citations omitted).

If this showing is made, then plaintiff may notify the potential opt-in claimants of the eligibility to participate in the collective action. *Marshall*, 2012 U.S. Dist. LEXIS 161768 at *10. However, "'[w]hen sufficient evidence in the record at the initial 'notice' stage makes it clear that notice is not appropriate, . . . a court can . . . deny certification outright.'" *Bouthner*, 2012 U.S. Dist. LEXIS 28497 at *16 (citations omitted).

Step two of the process "takes place later, typically at the close of discovery, at which point the court examines closely, on a fully developed record, whether the class members actually are similarly situated." *Id.* at *11. At this stage, the court engages in a more rigorous analysis that utilizes the procedural provisions found in Rule 23. *See Espenscheid* 705 F.3d at 772 ("[D]espite the difference between a collective action and a class action and the absence from the collective-action section of the Fair Labor Standards Act of the kind of detailed procedural provisions found in Rule 23, there isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards, though with some terminological differences.").

Here, plaintiffs have failed to put forth sufficient facts to permit conditional certification.

## II.   PLAINTIFFS HAVE FAILED TO SHOW THE EXISTENCE OF A COMMON EARLY-ARRIVAL POLICY BY BERKELEY.

### A.   The Evidence Shows There Was No Common Early-Arrival Policy Of Berkeley Uniformly Applied to Berkeley Employees.

Plaintiffs' bare allegation that they "were instructed by Berkeley to arrive at work at least 15 minutes before the start of my shift" (Cond. Cert. Memo Ex. A ¶ 6) does not create the factual nexus that connects them to other potential plaintiffs as victims of an unlawful practice.

12

Plaintiffs do not even identify which shifts they worked, who told them this was the policy, when they were told this, how often they were told this, or if and when such a policy was enforced. *See, e.g.*, *Bouthner*, 2012 U.S. Dist. LEXIS 28497 at *19 (denying conditional certification because "the Plaintiffs have provided no actual evidence to support their claims that the [defendants] maintained any kind of policy to avoid paying overtime wages . . . . Instead, Plaintiffs essentially rely on the broad allegations contained in the Second Amended Complaint and the three one-page declarations attached to their motion for conditional certification").

Moreover, Plaintiffs allege that they were required by Berkeley to arrive 15 minutes before the start of their shift to attend 15-minute mandatory meetings.  SAC ¶¶ 15, 20-22. Plaintiff Freeman, however, concedes that ***no such meetings take place***.  *See* Statement of Facts ("SOF") ¶¶ 22-23.  Berkeley has no written policy requiring its line workers to arrive 15 minutes before the start of their shift, Plaintiffs have provided no evidence of any such written policy of Berkeley, and Plaintiff Freeman concedes there was no such written policy.  SOF ¶ 6.

In addition to Plaintiffs' facts being insufficient to show a common policy of Berkeley, the evidence further demonstrates the absence of a common Berkeley policy uniformly applied to Berkeley employees.  Berkeley has a Company Handbook setting forth the policies and practices of Berkeley, and nothing in the Handbook states that employees must arrive 15 minutes prior to their scheduled shift.  SOF ¶¶ 9-11.  Instead, the Handbook requires only that workers "be at [their] workstation or on-line ***at the start of the shift***."  SOF ¶ 11.

In accordance with the Handbook, Berkeley's arrival policy is simply that line workers are required to be on their lines and begin working at the start of their shifts, which commences with the ringing of a bell programmed to ring at the scheduled shift start time.  SOF ¶ 12.

Berkeley's clock-in procedure is also in line with the policy set forth in the Handbook. Beginning at approximately fifteen minutes before each shift, a Berkeley Production Assistant stations herself at the Berkeley time clock.  SOF ¶ 14.  As the Berkeley employees arrive for work, they walk through the entrance, pull their timecards from a wall file next to the time clock, and hand the time cards to the Production Assistant, who clocks them in.  SOF ¶ 15.  This process continues up to the start of the shift as the Berkeley employees arrive.  SOF ¶ 16.

Berkeley employees who arrive before the shift starts are free to wait in the break room, and while they wait, they do not engage in any work.  SOF ¶ 19.

Although there is no set policy, generally, approximately seven minutes before the shift start time, the Berkeley Assistant Production Manager begins to give line assignments to Berkeley employees who have arrived and clocked-in.   SOF ¶ 21.  This process continues up to, and in some instances after, the shift start time.  SOF ¶ 24.  Plaintiff Freeman concedes that although the time at which employees are informed of their line assignments varies by day, it is **not** a process that lasts 15 minutes.  SOF ¶ 23.

Furthermore, Plaintiff Freeman concedes that she was never disciplined by Berkeley for arriving less than 15 minutes before her shift and that she does not know of any other Berkeley employee so disciplined.   SOF ¶ 25.

After the ringing of the bell, the line employees begin working.  In fact, the conveyor belts used in the factory do not start until after the ringing of the bell.  SOF ¶¶ 26-27.

Finally, a sampling of the time cards from the proposed class period further demonstrates the lack of a common arrival policy.  These graphs represent actual clock-in times for one day during different months of the proposed class period, and show Berkeley employees clocking-in up to their scheduled shift start time.  SOF ¶18.

14

For instance, on March 25, 2011, six Berkeley employees clocked-in at 5:51 a.m., two at 5:52, one at 5:55, one at 5:56, one at 5:59, and one at 6:00.  Krause Dec. Ex. C.  On July 8, 2012, one Berkeley employee clocked-in at 5:51 a.m., two at 5:52, two at 5:53, ten at 5:54, nine at 5:55, and thirteen at 5:56.  Krause Dec. Ex. C.  Given that it only takes approximately three seconds to punch-in a single time card (SOF ¶ 17), these samples demonstrate the absence of a common Berkeley early arrival policy uniformly applied to Berkeley employees.

In addition to showing the lack of a common policy, the time card samples reveal the individualized inquiry that would be required under Plaintiffs' proposed theory – namely, discovering which line workers actually arrived 15 minutes before their shifts and started working on each day of the proposed class period would require hundreds of "mini trials," further making this case unsuitable for collective action treatment.

Accordingly, the evidence clearly indicates that Berkeley did not have a common policy requiring its line workers to arrive 15 minutes early that was uniformly applied to all Berkeley employees.  Because "sufficient evidence in the record at the initial 'notice' stage makes it clear that notice is not appropriate," this Court should deny certification outright.  *Bouthner*, 2012 U.S. Dist. LEXIS 28497 at *16.

**B.    Plaintiffs' Attempt To Tie Berkeley To REM's Policy Demonstrates The Lack Of A Berkeley Policy.**

Because Plaintiffs cannot point to a common Berkeley policy, they instead seek to tie Berkeley to an alleged policy of REM; yet they provide no evidence that this alleged REM policy was ever applied by Berkeley to Berkeley employees.

At some unspecified time, REM created a document stating that REM employees "[m]ust be [at the Facility] 15 minutes prior to schedule starting time."  SOF ¶ 52.  Plaintiffs fail to identify when, if ever, this document was created and/or implemented.

15

Moreover, this document, which was produced by REM in discovery, was never shown to, reviewed, or authorized by anyone at Berkeley.  SOF ¶¶ 7, 53.  This REM document is unsigned and undated, and no party has produced a signed or dated copy of this document.  SOF ¶ 54.  Plaintiff Freeman concedes that she did not sign such a document and has "no idea" whether it was presented to her at her REM orientation.  SOF ¶ 54.

Plaintiffs simply provide no basis to determine when, if ever, this REM document was made.  Nor do they offer evidence that this REM document created a policy that was applied to Berkeley employees by Berkeley.

Furthermore, the evidence shows that any REM policy was not applied by Berkeley against Berkeley employees.  REM is a separate corporate entity that has separate offices from Berkeley, no common ownership with Berkeley, and which makes its own decisions as to who it hires and fires.  SOF ¶¶ 28-31.

Moreover, REM has policies and practices for its employees working at the Facility separate and distinct from Berkeley's policies and practices, a fact which Plaintiff Freeman understood and admitted.  SOF ¶¶ 35, 60.  REM keeps its own personnel files of its employees; REM assigns its employees to the Facility; REM employees have a different orientation than Berkeley employees; REM employees do not know whether they will be engaged to work on a particular day; REM maintains managers on-site at the Facility to supervise and discipline REM employees; and REM pays its employees working at the Facility.  SOF ¶¶ 33, 36-37,46, 49-51.

REM employees also have a different sign-in process than Berkeley, use a different time card than Berkeley employees, clock themselves in at a different time clock than Berkeley employees, and use a different clock-in procedure than Berkeley employees.  SOF ¶¶ 38-41.

Plaintiffs provide no evidence to show that REM's policies and practices are applied to Berkeley employees.  Nor do they provide any evidence beyond their bare allegation to link the undated, unsigned, REM document to Berkeley.

Accordingly, Plaintiffs fail to show a common policy of Berkeley or any other factual nexus linking them to other potential plaintiffs as victims of an unlawful practice of Berkeley.

## III.   PLAINTIFFS HAVE FAILED TO PROVIDE EVIDENCE OF WHICH EMPLOYEES ARE "SIMILARLY SITUATED."

### A.   There Is No Evidence Of Which Berkeley Employees Are Similarly Situated.

The only allegation linking Plaintiffs to other Berkeley line workers is the portion of their declarations stating that they had to attend mandatory meetings for the 15 minutes before their shifts.  *See* Cond. Cert. Memo Ex. A ¶ 9.  Yet, after filing the declaration, Plaintiff Freeman admitted that no such meetings actually took place.  SOF ¶¶ 22-23.

Moreover, Plaintiffs have excluded any facts relating to the extent to which the alleged arrival policy of Berkeley was applied to other Berkeley employees.  *See, e.g.*, *Zheng v. Good Fortune Supermarket Group (USA), Inc.*, 2013 U.S. Dist. LEXIS 130673, *15 (E.D.N.Y. Sept. 12, 2013) (denying conditional certification because "plaintiff has made no effort to detail the precise mechanisms by which she observed any other clerk being injured").

Similarly, here, during the proposed class period and up to July 2013, Berkeley ran two shifts during the day: 6:00 a.m. to 4:30 p.m. and 5:00 p.m. to 3:30 a.m.  SOF ¶ 2.  Plaintiffs do not identify which shifts they worked on, or whether the alleged policy applied to both shifts.

Furthermore, Plaintiffs present the declarations of two former Berkeley employees which state they were employed by Berkeley for a period from November 2011 through June 2012. Plaintiffs present no evidence, however, as to when the alleged policy went into effect, or how long it was in effect, if ever.  Thus, there is no evidence supporting Plaintiffs' three year

17

proposed class period.  Finally, Plaintiffs present no evidence that this alleged policy was ever enforced or uniformly applied to all Berkeley line workers.

Plaintiffs' motion simply assumes a policy was always in place and applied to all employees.  Such an assumption cannot stand in the absence of evidence by Plaintiffs and in the face of the evidence presented by Berkeley.  Because Plaintiffs have failed to present evidence that there are other Berkeley employees who are similarly situated, their motion for conditional certification should be denied.

**B.     There Is No Evidence That There Are Similarly Situated REM Employees.**

Plaintiffs have also failed to identify the REM employees that are "similarly situated." The time REM employees spend waiting to be engaged is not compensable under the FLSA. The federal "regulations which clarify the 'waiting to be engaged' doctrine state that an employee's on-call time is only compensable when 'the employee is unable to use the time effectively for his own purposes.'"  *Cleary v. ADM Milling Co*., 827 F. Supp. 472, 475 (N.D. Ill. 1993) (*citing* 29 C.F.R. § 785.15).  "This does not mean 'that the employee must have substantially the same flexibility or freedom as he would if not on-call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject.'"  *Id.* (*quoting Bright v. Houston Northwest Medical Center Survivor, Inc.*, 934 F.2d 671, 677 (5th Cir. Tex. 1991)).

Here, REM employees arrive at the Facility with the understanding that they may not be engaged to work on the particular day they show up, and ***Plaintiffs do not seek compensation for this time spent waiting to be engaged***.  *See* SOF ¶ 48.  While the REM employees wait before the scheduled shift start time, they do not perform any labor, and they are free to eat and drink in the break room, talk to other REM employees, or use the restroom.  SOF ¶ 44.  REM

employees who arrive less than fifteen minutes before the shift could still be engaged to work at the shift start time without discipline, and Plaintiff Freeman concedes that she was never disciplined by REM for arriving less than fifteen minutes before the shift or aware of any REM employee who was so disciplined.  SOF ¶¶ 56-57.

Furthermore, if a REM employee is not selected by the REM manager to be engaged on a particular day, the REM employee can choose to either leave the facility or continue waiting for possible work.  SOF ¶ 47.  Thus, REM employees do not perform any work at the Facility unless they are selected to do so by REM, and the time spent waiting to be engaged is not compensable time under the FLSA.  Accordingly, Plaintiffs have failed to provide any evidence that there are similarly situated REM employees who are owed overtime wages by Berkeley.

## IV.    PLAINTIFFS' PROPOSED NOTICE MUST BE AMENDED.

If conditional certification is granted, Plaintiffs' proposed notice must be amended. Plaintiffs have not set forth a proposed class definition in their moving papers.  Based on the proposed notice, it appears Plaintiffs seek to conditionally certify the following class:

> All people who performed duties as a line worker on behalf of the R.E.M. Group, Inc. or Berkeley Contract Packaging, LLC, from August 23, 2010 to present and who worked in excess of forty (40) hours in a single week.

*See* Cond. Cert. Memo Ex. D, First Am. Notice, p. 2.

At minimum, the class definition must be adjusted so that it only applies to line workers at the Facility in Edwardsville, Illinois, who: (1) actually arrived 15 minutes before their shift; (2) worked forty (40) hours or more during the week in which they arrived 15 minutes early; and (3) were not paid overtime compensation during the week in which they arrived 15 minutes early and worked forty (40) hours or more.  As set forth above, some line workers work forty hours or

more per week, while others work less than forty hours per week, and an individual's hours may also vary from week to week.  SOF ¶ 5.

Additionally, the notice should identify which shifts are at issue, as well as the time period during which the alleged policy was in effect.

Finally, the notice exceeds the maximum three-year statute of limitations provided by the FLSA, which states that the cause of action is commenced for a member of a collective action when each person opts-in to the action. 29 U.S.C. § 256(b).  Thus, if Plaintiffs' evidence is sufficient for a finding that a common policy was in place and applied at all times in the past three years, the August 2010 date should be amended to November 2010.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' First Amended Combined Motion to Conditionally Certify Class, Order Disclosures of Putative Class Members' Names and Contact Information, and to Facilitate Class Notice should be denied.


Dated: October 28, 2013            /s/ Kevin P. Green
                                   Thomas P. Rosenfeld #06301406
                                   Kevin P. Green #06299905
                                   Goldenberg Heller Antognoli & Rowland, P.C.
                                   2227 South State Route 157
                                   Edwardsville, IL  62025
                                   (618) 656-5150
                                   tom@ghalaw.com
                                   kevin@ghalaw.com

                                   *Attorneys for Defendant Berkeley Contract*
                                   *Packaging, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing motion was electronically filed with the United States District Court, Southern District of Illinois, and that copies were sent electronically on this 28th day of October, 2013, to all attorneys of record.

/s/ Kevin P. Green